Court. Good morning, Your Honors. Anthony Poidmore for the appellant Berry. Good morning. As the Court knows, this case is up here on the grant of a summary judgment. It's basically our position that the facts were not adequately considered. They either were supplied in favor of the county in this regard where they did not exist in the record, or the reasonable inferences that could be drawn from some of these facts in plaintiff's favor, in Mr. Berry's favor, were ignored or not drawn. For example, the district court first cites to Lamb's Chapel and cites the language that there may be a compelling state interest in attempting to avoid violations of the Establishment Clause. Then seems to go from there without an analysis of the facts supporting a violation of the Establishment Clause to a finding that that then is a valid government purpose. But there's no real discussion of whether there's a plausible fear. If you look at the facts in this case, for example, with Mr. Berry's desire to be able to respond to his clients, social service clients, in their inquiries or comments regarding religion, he is extremely sensitive, obviously, from the facts. He is not to express himself in a manner that would make it appear that he is speaking on behalf of the government or that it's compelling. But we know the fact, if we're stuck with the facts in this case. Right. My understanding is that we don't know whether he would have gotten any complaints or not because they didn't let it go to that point. So when he says there were no complaints, I mean, essentially, they told him, we don't want you talking to clients about religion, right? They, in fact, say there was a complaint when they're really – that's one of the factual arguments back and forth between the parties, whether that was a complaint or an inquiry. But if you look at the actual facts, without characterizing it, it certainly was an individual, a co-employee, who came to one of the supervisors and reported that she had observed Mr. Berry reading from the Bible with one of the clients and said, made a statement, I thought that was against the rules. When asked, when the supervisor was asked, did the individual appear or state she was upset? No. Indicate that she was in disagreement with what he was doing? No. In fact, she didn't want him to get in trouble. She was just making this statement. I think the reasonable inference from that is the employee appears to be exploring the boundaries of what the rules are within the county herself. Perhaps she wanted to be able to do the same thing, and so makes an inquiry. And this does, incidentally, extend over some period of time. There could have been complaints. I don't think there's any plausible evidence that there was. Do you think a complaint is necessary? I think that there should be some reasonable grounds for thinking this is going to be – Suppose it's just observation on the part of the – of management. Observation that it's disrupting the workplace or harassing – I would ask you a different way. Is your concern that there was some regulation of his conduct, and in your view there should be none, that the regulation was unreasonable? It was unreasonable. It was too broad and was unreasonable. He wasn't asking that, for example, that he be permitted to evangelize or proselytize. In fact – No, he said he couldn't help it. No. He said he had to give an answer to those who inquired as to the hope that was in him. And that was the – When you say too broad, though, I mean, what wouldn't be too broad? Well, in this case, all he was seeking was the right to respond. And he is not indicating that he should be able to initiate this or to preach the gospel to these people, as some of the cases indicate. So it wouldn't be too broad if he were permitted from – if he were prohibited from preaching. I'm sorry? I say it would not be too broad if he were prohibited from preaching during working hours while the clients were present. If he were prohibited from preaching and initiating that, I would think that the government entity would have been within their grounds. That's not even what he's seeking. Okay. Just so that I have the facts correctly, all right, he – well, he only asked to be able to respond. But doesn't he say that part of his – being an evangelical Christian, part of that is that you are supposed to proselytize and talk to people about your religion? Yeah, what he – I mean, that's part of what his religious tenets involved. That's part of what his religious tenets were. But his response as to why he wanted to do this was that he was called upon to study, make himself approved so he could give an answer to those who inquire about him. Well, we have – we've got – they told him he couldn't have his Bible out on the desk when he had clients in the office. Right. And they told him that he had to take down the Jesus off the Happy Birthday Jesus with clients in the office. And it appears that it's undisputed that he did do interviews in his office. Correct. Now, is it also undisputed that he could have his Bible out and read in his – read the Bible in his office if the clients were not there? If no one was around, I assume he could because what the evidence is he could keep it at his desk in an envelope in the desk. And he could take it out if he didn't have clients there. Right. And then also there was the issue about there's a meeting room or what – there's some room there. Right. That he wanted to be able to have Bible studies or groups. Pray together. At – in that room. And they told him no. And they said because if we let you do that, then that means we would have to open it up to – I want to say anyone. Satanists, I think they said. Well, but they would have to allow anyone that they would not be able to discriminate on that. Now, if he wanted to pray with other people in his office during the noon hour or whatever, as long as he wasn't, you know, harassing other people, you know, pulling them in the hallway and saying, come in and pray with me, could he do that? Presumably he could. Now, getting to his cubicle, as the court pointed out, displays were permitted in the cubicle. And the evidence and questions were what types were not. Well, Mr. Berry's Bible and his happy birthday Jesus. When inquiries were made about other symbols, Wicca symbols, Confucius sayings, there was no indication that those would be prohibited. Now, he could have had those if he didn't interview people there, right? Isn't that undisputed also? The other people did have things like that, even interviewing people. So what I'm pointing out is that there seems to be a discrimination content-based. What exactly does the record show that other people had? They had, for example, witches and other Halloween displays. They had inspirational sayings, things of that nature. And certainly, according to the questioning of the supervisor, other things would have been permitted, such as what I've pointed out, the sayings of Confucius. I would assume other... Are you saying some of these are arguably religious? Yes. And that was the point, that when he was inquired as to what kind of religious symbols would not be permitted, it seemed to focus in on Mr. Berry's choice. Well, there also, in my understanding of the position, is that Mr. Berry interviews people who are trying to get off welfare and are applying for assistance in that process. He transitions them, yes. And so when people come in, they're asking for something. I mean, they want either some sort of benefits or some sort of transitionary benefits. Correct. And so with giving all inferences in favor of your client, I'm believing that it's the employer's position that they're saying, well, people could feel that their benefits would be conditioned on listening to him or somehow professing Jesus Christ as their Savior or something to that extent, and also that the employer could be sued, say, if he denied someone benefits, saying, well, the reason that I was denied benefits is that I didn't want to talk to him about religion. Yes. And our position is that's purely speculative and no different than, for example, the female Muslim employee with a distinctive headdress interviewing in her cubicle. Would that make the individual reasonably feel they had to pander to Islam or a Sikh with his distinctive facial hair? Would that make them? And could you prohibit that? What if it was something just even more benign and not religious, like a PETA sticker? I mean, I don't think it's reasonable. Like a what? PETA. PETA. P-E-T-A. For the treatment of animals. Yes. Would that necessarily make the reasonable client? I mean, I assume we could all imagine somebody who's going to feel compelled no matter what sticker they see. A giant sticker, they're going to have to be a giant fan. But the reasonable client certainly, I don't think, can be said to feel compelled. Well, okay, would this be a factor at all in considering in terms of the tailoring, in terms of that obviously if you have to have a beard or if you have to wear certain clothes, you can't whip in and out of those when you're interviewing people. And what they were telling him is, you know, we want the Bible in an envelope and then when you want to use it, I'm assuming that it's not an appearance factor. Appearance you can't alter. Okay. But when the court says you have to, I'm not quite in tune with that because have to comes from within. In other words, they feel a religious obligation to distinctively identify themselves. Some people may do that if they're on the Christian faith with a cross. Would then a woman sitting in there interviewing clients with a cross make them feel compelled? Mr. Berry did it by having a Bible on his desk. When he was questioned, wouldn't that identify you as a Christian? He says, yes, exactly. I mean, he's identifying himself. It's passive speech. It's not like preaching to them where they would have to respond or feel uncomfortable. So I don't think that's any different than any other situation, and I don't think that's any great imposition. Okay. So now is that different than would you put that displaying religious objects in a different category than prohibiting him from discussing religion with clients? I think the displaying is even more benign, of course, because if he's actively discussing, a person feels more obligated to listen and perhaps respond. Every day in our everyday life, in and out of, as was pointed out, in and out of courts even, you see displays of the Ten Commandments or other things. You're used to seeing displays of this religion or that, and I don't think it makes reasonable people feel compelled to say, gee, I won't get my benefit. He won't give me good advice on how to transition out of welfare unless I tell him I love Jesus. I have a couple of questions about the Red Bluff Room, too. Okay. What is in the record in terms of evidence that it was used for quilting group meetings? Well, I'm looking at the record, and I don't see it, but it was in somewhere. Apparently it didn't get into the undisputed facts. Okay. But even aside from that, there's the other activities and groups. Do you contend that using the Red Bluff Room for retirement parties, birthday celebrations, or baby showers makes it a quasi-public forum? Activities sponsored by the junior men's rodeo activities. I think that even if it's not a public forum, you then get into content discrimination. You're opening it to the employees for non-business-related items. The only thing they wanted to do in there, they didn't even want to hold meetings for anybody. They wanted to pray together to those who voluntarily wanted to come in. So I don't think it's any different than opening it up for other employees. And the county wants to characterize these other activities as morale building. I don't see why those that are mutually interested in praying for each other and their work and their clients isn't also morale building. Okay. Did you want to reserve any time? Yes. Unless there's more questions, it's simply our point that this is a factual determination on summary judgment, and we think the facts don't warrant it. All right. Thank you. Thank you. Good morning, Your Honors. Good morning. My name is Jay Scott Smith. I'm here representing the interests of the County of Tehama in this matter. I think that, and in part we can see it from argument, but more clearly we can see it in the briefing, this case represents a number of fairly important principles, but I think one of the most important principles is that government agencies, such as the County of Tehama, need to have a fair amount of discretion in controlling the speech activities of those employees it hires to communicate with the general public on its behalf, as Mr. Berry has done. In this instance, Mr. Berry's argument claims at one point, well, I only want to engage in speech if it's initiated, religious-related speech, if it's initiated by my clients, and somehow that makes it less offensive. But if we look at the arguments that were made in the brief, it's very interesting. At one point in the brief, they even highlight, and I believe it's at page 15 in their brief, that Berry advocates responding to client-initiated speech with speech about the holistic and spiritual value concerning the client's social issues. Notice in that sentence that there's no mention that the client-initiated speech has anything to do with religion. It may have to do with social issues. That's made clear later on in the brief when they make the argument that Mr. Berry oughtn't be allowed to respond to a client who says, I'm having trouble getting a job because I'm suffering from alcoholism. Mr. Berry thinks that an appropriate response to that would be to discuss, again, he uses the phrase, the holistic spiritual component of the client's life when it comes to the social or well-being. In essence, that's suggesting that Mr. Berry thinks that he has a First Amendment right to engage when he's in faith-based counseling on county time. Now, there may be a lot of merit to providing faith-based counseling, but there are private social service organizations that do that. Government agencies, one, cannot do it. The California regulations that govern these employees specifically state that communications with clients are not to promote religious beliefs. And even if a client comes and says, I'm a religious person. I'd like to discuss religion with you in the context of the services that you're providing me. By responding in a religious manner, Mr. Berry is necessarily at that point promoting his religious beliefs, that they may coincide with the religious beliefs of the client. It doesn't change the fact that that's still a promotion of his religious beliefs, and in essence, an entanglement. As I understand his argument, he thinks that this was an inappropriate case for summary judgment. You, I'm assuming, think that it was appropriate, and you think so because you believe there are no material issues of fact in dispute. So why don't you tell us why you are so convinced that that's the case? The facts in the record of this case are large. The underlying historic facts are largely not in dispute. The inferences that counsel- What was the county doing in terms of regulating his conduct so far as you're concerned? The county specifically gave him a directive. It appears two places in the record. The more precise is, frankly, I forget the page number, but it would be Exhibit D in Tab 6, was a directive that he refrained from engaging in religious communications or offering to pray or actually praying with clients while discharging his responsibilities. That's an undisputed fact. There is a subsequent memorandum that sort of was in response to his pushing the envelope, if you will, with respect to placing items on his cubicle, that rephrased that as saying you were to adhere to the policy of absolute avoidance of religious communications with clients of the county of Tampa. Yeah, they also said that there was no attempt to interfere with his own religious beliefs. Correct. Merely a directive to control how he responded with- Clients of the county. I'm sorry, I didn't mean to cut you off, but it's specifically a directive controlling his both verbal communication in terms of his back-and-forth discussions with clients while on county time and a directive controlling his nonverbal communication with clients with respect to the religious artifacts that were posted. What about the people that would have to wear a certain dress or a certain beard or something along those lines? How do you compare those situations to Mr. Berry's? I think that there's two important differences. One is while certainly any information that might identify a person, we can't exclude all information. For that reason, I would even suggest that if Mr. Berry were wearing a cross on a necklace, there's nothing in the county's directive, because it specifically applies to posting materials, that he would be in violation of that directive. When somebody comes and is dressed in a certain way, yes, there is going to be some level of identity that that person has identified themselves as a religious person. But from an establishment clause avoidance standpoint, the critical element is promotion of religion, not just necessarily identifying one with one's religious beliefs. The comparison that we're drawing is as to items that are posted. Once he starts posting items on county property and asking the county to allow him to do that, a person sitting there is going to say, hey, county exercises some control over these cubicles or offices. I am forced, compelled as part of my welfare obligations to sit here, and this person is now communicating direct religious messages to me, and I have to sit there. That is, in essence, he is promoting in his capacity as a county official, a religious message and promoting his religion to those who come to sit there. So there's a distinction between what I would consider sort of the intrinsic, I'm just going to view this person based upon their outward appearance, and actual nonverbal communicative messages that are placed in the cubicle. This, again, also comes back to my original point that there has to be a significant amount of leeway offered to government agencies in trying to deal with these very complicated and very difficult problems. Even if one says, well, a happy birthday Jesus sign, it wouldn't necessarily violate the establishment clause. It certainly starts heading in that direction, and the government agency has to have a fair degree of discretion in dealing with those situations. And I would commend to the court the Second Circuit's approach in the Knight case, and I'll never pronounce it correctly. It's M-C-L-U-E, I think it is. The Second Circuit first notes that when we apply a pickering balancing under these circumstances, that when you're dealing with employees who have to have regular interaction with the general public, that the government's interest in regulating that interaction to avoid intruding upon the religious sensibilities of the clients is high. Well, you're saying the government has to have, or the agency, the employer, has to have a fair amount of discretion. I think I recall that appellants arguing that the government's actions have to meet strict scrutiny. They do not have to meet strict scrutiny under these circumstances. I believe that the law is clear on that. If I could just back up one second, because I noticed that Judge Tashima is thumbing through the index of my brief. The case I'm referring to is Markey v. Board of Cooperative Education, the Second Circuit 1998 case, and the other one is Knight v. Community Department of Public Health. Going back to the question that was posed, the strict scrutiny analysis that it is argued for is based upon, frankly, a misreading of the Smith opinion and its progeny. Smith, first of all, was a case that limited application of the strict scrutiny analysis to those circumstances where you only have a non-neutral regulation of private conduct. The Supreme Court has long recognized that a different standard applies when you're dealing with the regulation of employee speech. And there is not a single case that stands to the proposition that you would apply strict scrutiny under these circumstances. You apply either one of two things, which we submit as the appropriate regulatory framework, or analytical framework, excuse me, with respect to certainly the posting of information on the walls, or if it's just flat government speech, a person is acting on behalf of the government and speaking on behalf of the government, government gets to even make viewpoint-based decisions, and that, frankly, governs the actual interaction with clients on county time. If the county wants to provide an entirely religiously sterile, neutral advice to clients, it can direct its employees to do so. And they have no right, no First Amendment right, to either substitute or augment that message with their own religious sensibilities. I think the appellant was arguing that the department is speculating about, you know, what the problem would be, or that there is no showing. What is the government showing of what the government's, or the county's interest versus the department's? Well, two things. First of all, the showing of the need of a potential risk is relevant to a Pickering balancing test. That is if, as we submit, that the law is clear that that whole analysis does not apply with respect to the speech communications between Mr. Berry and his clients while on county time. So it really doesn't matter. The county could give him a script, and he has to follow it. But in terms of the, when we look at, when we're looking at the balance, the risk can be, to some extent, conjectural. And again, the Second Circuits, which are the only cases that really deal with these issues in the context of employees with regular contacts with the public, noted that the county does not have to wait around for the first person to file a formal complaint. There are certain behaviors, certain conduct that is inherently religious, and that the county has a right to delineate borders that its employees simply cannot cross in their dealings with the public. And it evens the court in the Markey decision, which even went so far as to say that it is often impossible for a government agency to delineate specific borders that would amount to, what would precisely amount to an establishment clause violation, therefore you can't do it versus what you cannot. So we have to give broad orders. In that case, a teacher was given a broad order. You just simply don't talk about religion with parents of the students, and you don't talk about religion in your classroom, period. It didn't matter in that case that nobody had complained. But the obvious dangers and the obvious risks that the county needs to steer wide of. I think Mr. Berry attempts to distinguish himself from a teacher. He does, but the point is he's still speaking on behalf of the county. And remember, in that decision, the Markey decision, even though we were dealing with a teacher, it wasn't just the communications with the students where the teacher would hold some special relationship that was at issue. In Markey, also at issue was a prohibition against speaking with parents, and in the facts of the case, specifically a parent who shared the teacher's religious viewpoints. And the court said, look, you just can't, a government agency can say, we're not going to let you when you're speaking on our time and our money and with the imprimatur of government approval. And any speech that Mr. Berry makes when he is having communications with clients is going to have the imprimatur of the government, because he is providing benefits, he is providing counseling services. Is there anything in the record that Mr. Berry could interview outside his office? What does the record show on that point? I recall in the record it saying that he does 90% of his interviews in his office, which would imply to me that 10% are done elsewhere. Frankly, the record doesn't have a specific, doesn't directly address that point. The facts of the case are Mr. Berry's testimony, and I'm not sure if it's actually in either the director or the assistant director's testimony either, is that 90% to 100% of the interviews are conducted at the cubicle. This raises the point that I'd like to respond to one of counsel's assertions about that Mr. Berry inquired, well, people have other symbols or stuff in their cubicle. There's nothing in the record that differentiates between cubicles used by people who are not interviewing clients and those that are actually interviewing clients. And again, the county's limitations here are what is going to be visible or what kind of compelled, if you will, receipt of the nonverbal communication that is posed by posting these religious artifacts. Let me ask you about the Red Bluff Room. Sure. Why shouldn't the department be required to allow employees to sign up and use the conference room for peaceful meetings regardless of the topic? Because that's not the purpose of the Red Bluff Conference Room. It's there for county business. And to suggest that merely having an occasional lunch, an occasional baby shower, an occasional dinner, means that a government agency has to open it up to virtually any group who wants to have a discussion on any basis renders that a competing use and turns this conference room essentially into a regulated Times Square. The Ninth Circuit in the DiLoretto decision said that you don't have to do that. In DiLoretto, you had actually opening up a particular forum for a particular type of expressive activity, a baseball field with commercial speech. And the court said even if the district or if a person wants to put up a relatively innocuous religious statement, that's not the same type of speech as is pure commercial ads. We're not going to require you to open it up. And the important part is this is where the Rosenberger decision and Lamb's Chapel are important because they tell the county what it would have to do if it did allow Mr. Berry's group, which is an organized meeting. He sent out flyers. He organized this meeting, an organized prayer group. Then they would, in fact, have to open up that to virtually any and all persons who want to talk about similar topics, be it religious bent, be it socialistic bent, be it an atheistic bent to talk about, as we discussed in our brief, the ability to dispute the growing influence of religion in the workplace. Well, his response would be, well, there's no showing that this is going to be a huge problem and that the room is going to be taken up all the time. But on your response to what you have to show to prevail on that particular issue would be what? All we have to demonstrate is that this room was not a public forum because he's not being prohibited from engaging in that speech. He's just being prohibited from engaging in that speech in the Red Bluff Conference Room. So if the county did not intentionally open up that room for the type of expressive activities that the plaintiff and his group wish to engage upon, they don't have to open it up to anybody. And I dare say if the mere having the occasional birthday party or shower constitutes opening it up, then the response of virtually every government agency in the state will be no more. We're not even doing that. Well, our analysis has to be let's assume that all of those things happened, except maybe the exception of the quilting. All right, let's assume all of that happened. You're saying as a matter of law, those facts do not indicate that it was a public forum? Right. Those are significantly different types of activities than are implicated by somebody who organizes a religious group to conduct prayer and to discuss religious topics as opposed to just simply having a unit-wide management created, if you will, birthday party, a one-time-a-year rodeo for the entire department that just happened to push off. So under the directive, what can Mr. Berry do at work? At work? Under the directive as it currently exists. He can read his Bible outside the presence of clients. He can engage in religious speech virtually anywhere in the workplace, including in his cubicle, just not with clients. He can engage in religious speech. He can engage in outright proselytizing with fellow employees so long as they don't object. His prayer group can pray at lunch. They can pray together wherever they're allowed to have lunch and breaks. Not in the Red Bluff room? Just not in the Red Bluff conference room. We're just not opening up a specific conference room for this behavior. That's all. If there are no other questions, since my time is now down to eight, seven, six. Any other questions? No. Thank you. Thank you very much, Your Honor. In response, I just want to point out that the county seems to concede, for example, that they can't or shouldn't be able to prohibit the Sikh from wearing their beard or the Muslim woman from wearing her shawl as identifying them. But he also concedes that a Christian could wear a cross. My confusion is, what's the difference between that Bible sitting on the table and the cross around his or her neck that says, I'm a follower of the Christian faith? I don't think there's any difference, and I fail to see any distinction there. Can we parse that out, though? It's the Bible on the desk and Happy Birthday Jesus, right? Okay, let's parse it out. But for summary judgment purposes, that's what he's claiming. Well, the Happy Birthday Jesus was a one-time event for one specific occasion, and that is Christmas. The ban wasn't that you simply can't have Happy Birthday Jesus. You can't do anything of a religious nature, say anything, show anything, at any time, in any place, in the presence of a client. So that includes the Bible on the desk, which he would like to have, even if he can't have Happy Birthday Jesus on the wall. That's the one thing. When counsel says that government agencies should have a fair amount of discretion... I guess, playing the devil's advocate, what Mr. Smith is obviously saying is that that speaks something. It's a nonverbal communication. Obviously, a Bible is, you know, people derive comfort from that and being able to refer to it as far as that goes. But if he had it in his office and he has it there when he can be there privately, why isn't that the comfort that he's seeking? And why isn't, as Mr. Smith would say, putting it right there on the desk where the client would be sitting, why isn't that saying more? Because it does speak. It makes one comment. I am a follower of the Christian faith. But it doesn't speak any more, any more broadly or any more strongly than the individual with the cross around their neck or, again, the Sikh or the Muslim or any other of a number of identifying characteristics that the individual follows a particular belief. That's the limit of what it says. We don't think that goes too far. Regarding their contention that the government agencies should have a fair amount of discretion, even granting that, this is not one of those situations where the employee's speech or conduct is garbling or contradicting the message of the employer, the government agency, not a situation where there's selective financing and the doctor's counseling regarding abortion or there's a program and a policy of diversity and the individual wants to put up religious commandments against homosexuality. This is not any of those things. Even granted that they have some amount of discretion. Factually here, where's the problem? Well, people feel really strongly about their religions. I think that that's an inference that can be made. And if you're sitting in front of someone that's a decision-maker, people feel that their religion is right. And if you're not that religion, they would feel that, is that going to impact whether I get these benefits? I think that's what they're saying. Some people feel very passionately about the environment and they bomb places because you're cutting down a tree. Some people feel very passionately about PETA. Some people feel passionately about a lot of things. I just don't think it's reasonable that because somebody has a sticker indicating that, you know, you should save the frogs or whatever, that that means you're going to have to comply with that in order to get benefits. And it just hasn't happened here. Not only hasn't it happened, but I don't think it's reasonable to assume it's going to happen, especially not in view of his professed intent, his knowledge of his bounds, and what he's done in the past. Every time he's tried to do something, as the record would show, he has sought out advice whether it was okay. Before he even put that Bible on his table, he called the state to see if it was okay, to get their ruling on the law. Before he used the red block room, he approached his supervisor, who did indicate to him that it would be okay so long as it was not specifically asked for and reserved if he just went in there and used it when it was empty. So according to the record, he was always sensitive to those things. I don't think there's any reasonable inference that he's going to be conducting himself or saying things in a manner that the client that he's interviewing thinks, boy, if I'm not a Christian, if I don't tell him Christ is great, I'm probably not going to get any good advice here or benefits. I just don't see that as being reasonable. There's no requirement. What in a sentence do you say this record prohibited him from doing? I'm sorry? What in a sentence do you say the county prohibited him from doing? Well, in a sentence, insofar as clients, anything having to do or touch on religion, speech, displays, conduct, nothing at all. Now, it's a little different with co-employees. I think you've passed the time. Okay, thank you. All right, thank you. This matter will then stand submitted.
judges: Farris, Tashima, Callahan